## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| William Ballou and Joan Williamson,<br><br>       Plaintiffs,<br><br>v.<br><br>Asset Marketing Services, LLC,<br>d/b/a GOVMINT.COM<br><br>       Defendant. | Case No. 21-cv-00694 (SRN/ECW)<br><br><br>**ORDER** |
| William Culver, on behalf of himself and all other similarly situated,<br><br>       Plaintiff,<br><br>v.<br><br>Asset Marketing Services, LLC,<br>d/b/a GOVMINT.COM<br><br>       Defendant. | Case No. 21-cv-01237 (SRN/ECW) |

Austin P. Smith, Bruce Steckler, and Bryan L. Bleichner, Steckler Wayne Cochran PLLC, 12720 Hillcrest Road, Suite 1045, Dallas, TX 75230; and Christopher P. Renz and Jeffrey D. Bores, Chestnut Cambronne PA, 100 Washington Avenue South, Suite 1700, Minneapolis, MN 55401, for Plaintiffs.

Cassandra B. Merrick, Mack H. Reed, and Stephen M. Premo, Madel PA, 800 Hennepin Avenue, Suite 800, Minneapolis, MN 55403, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

       This matter is before the Court on Defendant's Motions to Compel Arbitration and

Stay Proceedings filed in two related cases, 21-cv-00694 ("*Ballou* matter") [Doc. Nos. 10,

26] and 21-cv-01237 ("*Culver* matter") [Doc. No. 14], and Plaintiffs' Motions to Strike evidence Defendant submitted in support of those motions, *Ballou* matter [Doc. No. 40] and *Culver* matter [Doc. No. 27].   Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **DENIES** all of the motions.

## I.    BACKGROUND

### A.    The Complaints

Plaintiffs in both matters bring class action complaints against Defendant Asset Marketing Services, LLC ("AMS").[1]   (*See Ballou* Compl. [Doc. No. 1]; *Culver* Compl. [Doc. No. 1].)  Plaintiffs are customers who purchased one or more coins from Defendant from 2015 to the present.  (*Ballou* Compl. ¶ 51; *Culver* Compl. ¶ 49.)  Plaintiffs generally allege that AMS engaged in a scheme to defraud by intentionally misrepresenting the quality and value of coins that it sold.  (*Ballou* Compl. ¶¶ 62–103; *Culver* Compl. ¶¶ 66–116.)  In the *Ballou* matter, Plaintiffs assert claims of violation of Minnesota's Prevention of Consumer Fraud Act, Minnesota's Uniform Trade Practices Act, Minnesota's Deceptive Acts Perpetrated Against Senior Citizens,[2] unjust enrichment, and injunctive relief. (*Ballou* Compl. ¶¶ 62–103.)  In the *Culver* matter, Plaintiff asserts the same causes of action, but also adds a claim for negligence per se.  (*Culver* Compl. ¶ 66–116.)

---

[1]      Counsel for Plaintiffs in both cases are the same.

[2]      Both matters assert claims on behalf of an Elder Subclass.  (*Ballou* Compl. ¶¶ 5, 52–53; *Culver* Compl. ¶¶ 5, 7, 50–51.)  This count is asserted only on behalf of that Elder Subclass.  (*Ballou* Compl. ¶¶ 89–93; *Culver* Compl. ¶¶ 102–06.)

### 1. Defendant AMS

Defendant AMS is a Delaware company with a principal place of business in Minnesota. (*Ballou* Compl. ¶ 8; *Culver* Compl. ¶ 9.) AMS sells coins throughout the United States. (*Ballou* Compl. ¶ 14; *Culver* Compl. ¶ 15.) AMS advertises through many media channels including on its website, www.govmint.com. (Declaration of Robert Ostman [Doc. No. 31] ("Ostman Decl.") ¶ 5.)

### 2. AMS's Terms and Conditions

AMS publishes its terms and conditions on its website. (*See id.* ¶ 9.) It is undisputed that the terms and conditions contain an arbitration provision. (*See id.* Exs. 43, 45.)

Generally, when a customer places an order, AMS sends a confirmation e-mail with a link to its terms and conditions at the bottom of the e-mail. (*See* Declaration of Kelsey Knight [Doc. No. 30] ("Knight Decl.") ¶ 8; Ostman Decl. ¶ 26.) AMS then ships the coins to the customer with an invoice enclosed. (Ostman Decl. ¶ 17.) AMS has revised its invoice three times throughout the relevant period, keeping the substance of the arbitration provision largely the same until January 2019. (*See id.* Exs. 2, 34, 44.) With the third revision, in January 2019, AMS removed the arbitration provision from the backside of the invoice and added the following on the front of the invoice:

> NOTICE FOR ALL PURCHASES OTHER THAN BULLION ITEMS AND OTHER FINAL SALE ITEMS With the exception of Bullion Items and other Final Sale Items, GovMint.com is willing to sell its product(s) to you only if you accept all of our Terms and Conditions, which are available online at www.govmint.com/terms-conditions or by phone at 1-800-721-0320. If you do not agree to all of the Terms and Conditions, then GovMint.com is unwilling to sell its product(s) to you, in which case you must return your purchase for a full refund in accordance with our Return

Policy. By keeping your purchase for more than 30 days after you receive it, you are agreeing to the Terms and Conditions.

(*Id.* ¶ 31, Ex. 44.)

In February 2016, AMS implemented an order verification process ("Verification Process") for telephone orders priced above a threshold amount. (*Id.* ¶ 27.) When a customer places a telephone order above the threshold amount, the Verification Process requires the AMS sales representative to transfer the customer to an AMS customer service representative to verify the order. (*Id.* ¶ 28.) Reading from a prepared script, the customer service representative confirms the order and the customer's credit card information, and mentions that the purchase is subject to AMS's terms and conditions and to a 30-day return policy. (*Id.*; *see also* Reed Decl. Exs. 1–23.)

### 3.   William Ballou's Claims

Plaintiff William Ballou is an elderly man who lives in Florida. (*Ballou* Compl. ¶ 15.) Between 2015 and 2019, Ballou purchased coins from AMS. (*Id.* ¶¶ 16, 19.) The relationship began when AMS contacted Ballou to offer him commemorative coins. (*Id.* ¶ 17.) Ballou, although knowing nothing about commemorative coins, expressed interest, which prompted the sales representative to send him a gold sample. (*Id.* ¶¶ 17–18.) Consequently, Ballou believed he was purchasing gold and other precious metals. (*Id.* ¶ 18.)

In a series of transactions from 2015 to 2019, Ballou ordered by telephone 127 coins, totaling $630,000.[3]  (*Id.* ¶¶ 16, 20.)  When ordering the coins, he provided his credit card information to the sales representative over the telephone.  (*Id.* ¶ 21.)  Prior to giving his payment, he was never required to read AMS's terms and conditions.  (*Id.* ¶ 21.)  During this time, Ballou returned one of his purchases within 30 days of receipt.  (Ostman Decl. ¶ 34.)

### 4.    Joan Williamson's Claims

Plaintiff Joan Williamson is an elderly woman who lives in California.  (*Ballou* Compl. ¶ 15.)  From 2015 to 2019, Williamson purchased coins over the telephone from AMS by providing her bank account information.  (*Id.* ¶¶ 16, 28, 31.)  She was never asked to read AMS's terms and conditions prior to placing the orders.  (*Id.* ¶ 31.)  Over that period, she purchased coins in an amount over $13,000.  (*Id.* ¶ 30.)  Williamson never returned any of her purchases.  (Ostman Decl. ¶ 40.)

### 5.    William Culver's Claims

Plaintiff William Culver is an elderly man who lives on a fixed income in Texas.  (*Culver* Compl. ¶ 16.)   Between 2013 and 2018, AMS solicited Culver to purchase commemorative coins.  (*Id.* ¶ 17.)  Culver knew nothing about coins prior to this time, but

---

[3]     AMS alleges that Ballou made some online orders.  (*Ballou* matter [Doc. No. 29]; *Culver* Matter [Doc. No. 17] at 2–4; *see also* Ostman Decl. ¶¶ 8–11.)  But Ballou's Complaint and all of Plaintiffs' allegations relate only to telephone orders.  (*Ballou* Compl. ¶¶ 16–17, 20–21; *see also Ballou* matter [Doc. No. 35]; *Culver* matter [Doc. No. 23] at 4, 5 n.3.)  Accordingly, the Court will only review the arguments and facts related to telephone orders of all three Plaintiffs.

after receiving information from the sales representative, he became interested, believing he was investing in gold and precious metals.  (*Id.* ¶¶ 18–19.)  Culver purchased via telephone 70 coins at a price of $45,816.  (*Id.* ¶ 21.)  Culver was never asked to review AMS's terms and conditions prior to purchasing the coins.  (*Id.* ¶ 22.)  Culver returned five purchases within 30 days of receiving them.  (Ostman Decl. ¶ 60.)

### B.    The 2016 Consent Order

Both Complaints refer to and attach the Consent Order issued by the Minnesota Department of Commerce ("Commerce Department") that was signed on December 5, 2016 ("2016 Consent Order").  (*Ballou* Compl. ¶¶ 1–2, 40–48, Ex. A; *Culver* Compl. ¶¶ 1–2, 38–46, Ex. A.)

The 2016 Consent Order arose from a complaint filed against AMS, alleging that an AMS sales representative took advantage of an elderly woman by swindling her out of hundreds of thousands of dollars in less than one year.  (2016 Consent Order at 1–5.)  The Commerce Department found that the sales representative had, indeed, solicited and taken advantage of the woman, and that AMS failed to adequately carry out its internal quality processes and procedures to detect and correct this behavior.  (*Id.* at 2–6.)  This constituted a lack of adequate supervision of a bullion coin dealer under Minn. Stat. § 80G.03, subd. 2. (*Id.* at 6.)

The Commerce Department made other findings as well.  (*Id.* at 6–7.)  For example, it found that AMS's notice of a shortened statute of limitations period on an invoice that

was not disclosed prior to the sale violated Minn. Stat. § 80G.07, subd. 14.[4]  (*Id.* at 6.)  It also found that AMS's decision to place its terms and conditions on its website, including the arbitration provision, while failing to disclose these terms prior to the sale, is a misrepresentation of terms, which also violates Minn. Stat. § 80G.07, subd. 14.  (*Id.* at 6–7.)  Lastly, the Commerce Department found that the Consent Order "is in the public interest."  (*Id.* at 7.)

The 2016 Consent Order set parameters for how AMS was to conduct business moving forward.  (*See id.* at 7–8.)  It required AMS to pay a penalty and the government's investigation costs.  (*Id.* at 8.)  It also required AMS to revise and update its procedures governing quality assurance, compliance, and sales practices.  (*Id.* at 7.)  Lastly, as relevant here, it demanded as follows:

> IT IS FURTHER ORDERED that Respondent shall not rely on any of its written terms or conditions of bullion coin/product sale to a consumer unless: (1) the term or condition upon which Respondent seeks to rely was disclosed to the consumer in accordance with Minn. Stat. § 80G.07, subd. 1, or (2) the consumer and Respondent have a signed written agreement for the purchase of bullion products disclosing such terms.

(*Id.* at 7–8.)

## C.   Procedural Background

The Ballou Complaint was filed on March 12, 2021.  (*Ballou* Compl.)  The Culver Complaint was filed on May 18, 2021.  (*Culver* Compl.)

---

[4]    Minn. Stat. § 80G.07 has been found unconstitutional. *Styczinski v. Arnold*, Civ. No. 20-CV-2019 (NEB/BRT), 2021 WL 3131550, at *7–8 (D. Minn. July 23, 2021) ("Section 80G.07 applies to commerce that takes place wholly outside Minnesota, making it unconstitutionally extraterritorial.").

### 1.     Motions to Compel Arbitration and Stay Proceedings

Also on May 18, 2021, AMS filed motions to compel arbitration and stay proceedings in both matters.  The Court consolidated the *Ballou* and *Culver* matters for purposes of this motion.  (*See Ballou* matter [Doc. Nos. 22, 24]; *Culver* Matter [Doc. No. 12].)

AMS filed its memorandum in support of its motion to compel arbitration, asserting that a valid arbitration agreement exists between AMS and all three Plaintiffs.[5]  (*Ballou* matter [Doc. No. 29]; *Culver* Matter [Doc. No. 17] (together, "Def.'s Mem.") at 25–33.)  As to Ballou and Culver, AMS asserts that they agreed to the arbitration provision by keeping the coins for more than 30 days, as outlined on the invoices and in the e-mail confirmations, and as agreed to during the Verification Process.  (*Id.* at 26–28.)  Regarding Williamson, AMS contends that she agreed to the arbitration provision by not returning the product within 30 days as outlined on her invoices and on the telephone.  (*Id.* at 27–28.)

AMS contends that it entered enforceable "clickwrap" or "shrinkwrap" agreements with the Plaintiffs.  (*Id.* at 28–33.)  As a shrinkwrap agreement, AMS argues that it conditioned its acceptance of Plaintiffs' offers to buy coins on Plaintiffs' agreement with its terms and conditions, including the arbitration provision, which were accessible on the

---

[5]     AMS further argues that the issues raised by Plaintiffs in these motions are "gateway" issues for an arbitrator to decide.  (*Ballou* matter [Doc. No. 29]; *Culver* Matter [Doc. No. 17] at 23–25.)  But Plaintiffs explicitly challenge whether a valid arbitration agreement exists.  (*Ballou* matter [Doc. No. 35]; *Culver* matter [Doc. No. 23] at 4).  And whether an arbitration agreement exists is an issue for this Court.  *Gannon v. Cir. City Stores, Inc.*, 262 F.3d 677, 680 (8th Cir. 2001).

backside of the invoices and on its website.  (*See id.* at 32–33; *see also Ballou* matter [Doc. No. 50]; *Culver* matter [Doc. No. 38] (together, "Def.'s Reply") at 7–8.)  Accordingly, AMS contends that the matters in dispute are covered by a binding arbitration agreement, and, therefore, the Court must stay the *Ballou* and *Culver* matters and direct Plaintiffs to proceed to arbitration individually.  (Def.'s Mem. at 33–37.)

Plaintiffs respond by arguing that the Court should deny this motion because (1) no valid arbitration agreements exists, and (2) the 2016 Consent Order prohibits AMS from relying on its terms and conditions.  (*Ballou* matter [Doc. No. 35]; *Culver* matter [Doc. No. 23] (together, "Pls.' Opp'n") at 4.)  Regarding the arbitration provision, Plaintiffs assert that they never saw, let alone agreed to, the arbitration provision.  (*Id.* at 11–34.)  Plaintiffs argue that these were not clickwrap or shrinkwrap agreements, and thus the arbitration provision constitutes a proposed additional term that Plaintiffs never accepted.  (*Id.* at 13–21.)  Plaintiffs also contend that Defendant failed to provide sufficient notice to them of the arbitration provision.  (*Id.* at 27–30.)

Plaintiffs further contend that they have standing to enforce the 2016 Consent Order because it (1) sought to protect them, (2) sought to stop this exact behavior, and (3) contemplates enforcement by them.  (*Id.* at 7–8.)  As such, Plaintiffs assert that AMS cannot rely on its arbitration provision because AMS failed to follow the terms of the 2016 Consent Order.  (Pls.' Opp'n at 7–9; *Ballou* Matter [Doc. No. 57], *Culver* Matter [Doc. No. 45] (together, "Pls.' Reply") at 8.)

### 2.    Motions to Strike

On September 3, 2021, Plaintiffs filed motions to strike evidence submitted in support of Defendant's motion to compel arbitration and stay proceedings. (*Ballou* matter [Doc. No. 42]; *Culver* matter [Doc. No. 29] (together, "Pls.' Mem. Mot. Strike").)   In particular, Plaintiffs seek to exclude the following: (1) transcripts of the Verification Process telephone conversations attached to defense counsel's declaration; (2) paragraphs 8–19 of the Declaration of Robert Ostman, AMS's Director of Customer Operations; and (3) paragraphs 4–9 and 13–15 of, and exhibits 1, 2, 9, and 10 submitted with, the Declaration of Kelsey Knight, AMS's Director of Digital Marketing. (*Id.* at 2–9; Knight Decl. ¶ 3.)  Plaintiffs' main argument is that the information it seeks to exclude fails to meet the requirements of Rule 56(e) of the Federal Rules of Civil Procedure because the declarants lack personal knowledge or experience concerning that information.  (Pls.' Mem. Mot. Strike at 4–5, 8–9.)  Defendant opposed the motion. (*Ballou* matter [Doc. No. 46]; *Culver* matter [Doc. No. 34].)

## II.    DISCUSSION

### A.    Plaintiffs' Motion to Strike

As noted, Plaintiffs move to strike all or portions of three declarations that Defendant submitted in support of its motion to compel, citing the affidavit requirements of Rule 56(e). (Pls.' Mem. Mot. Strike at 3.)  Federal courts "may strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f) (emphasis added).  Thus, as this Court has repeatedly held, a motion to strike an affidavit or declaration is not authorized by the Federal Rules of Civil Procedure

or the local rules. *See, e.g., Carlson Mktg. Grp., Inc. v. Royal Indem. Co.*, Civ. No. 04-CV-3368, 2006 WL 2917173, at *2 (D. Minn. Oct. 11, 2006) ("[T]here is no such thing as a 'motion to strike'—at least when the paper being targeted is a memorandum or affidavit . . . ."); *Albert v. GEICO Gen. Ins. Co.*, Civ. No. 18-cv-113 (SRN/ECW), 2019 WL 1058251, at *6 (D. Minn. Mar. 5, 2019), *aff'd*, 784 F. App'x 978 (8th Cir. 2019). Accordingly, Plaintiffs' motions to strike are procedurally improper and are therefore denied.

### B. Legal Standard for a Motion to Compel Arbitration

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, reflects a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *see also Kelly v. Golden*, 352 F.3d 344, 349 (8th Cir. 2003) ("[C]ontract provisions directing arbitration shall be enforceable in all but limited circumstances."). However, to benefit from this presumption, parties must "have contractually agreed to be bound by arbitration." *Shockley v. PrimeLending*, 929 F.3d 1012, 1017 (8th Cir. 2019) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

When a party challenges the existence of a valid arbitration agreement, as is here, courts consider (1) whether there is a valid agreement to arbitrate between the parties and (2) whether the dispute falls within the scope of that arbitration agreement.[6] *Simitar Ent.,*

---

[6]     Because the Court finds no valid arbitration agreement exists here, the Court does not reach the second step of the analysis.

*Inc. v. Silva Ent., Inc.*, 44 F. Supp. 2d 986, 992 (D. Minn. 1999). In conducting this two-step inquiry, courts apply "ordinary state law contract principles to decide whether parties have agreed to arbitrate a particular matter." *Keymer v. Mgmt. Recruiters Int'l, Inc.*, 169 F.3d 501, 504 (8th Cir. 1999). The moving party "carries the burden to prove a valid and enforceable agreement." *Shockley*, 929 F.3d at 1017.

A motion to compel arbitration is analyzed either as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), or as a motion for summary judgment under Federal Rule of Civil Procedure 56, depending on whether "matters outside the pleadings" have been presented and considered. *City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 881–82 (8th Cir. 2017); *accord Seldin v. Seldin*, 879 F.3d 269, 272 (8th Cir. 2018). Because matters outside the pleadings have been presented and considered, the Court analyzes this as a motion under the summary-judgment standard.

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## C.    Defendant's Motions to Compel Arbitration

Defendant has the burden of establishing that a valid arbitration agreement exists. *See Shockley*, 929 F.3d at 1017.  To meet this burden, Defendant argues that it entered valid shrinkwrap agreements with the Plaintiffs, meaning that the Defendant did not accept Plaintiffs' offers to purchase coins until after Plaintiffs agreed to the terms and conditions, including the arbitration provision, by retaining possession of the coins for more than 30 days.  (Def.'s Mem. at 28–33.)  Defendant further asserts that Plaintiffs had notice or constructive notice of the arbitration provision by (1) receiving the invoices with the arbitration provision on its backside, (2) receiving the confirmation e-mails, and (3) agreeing to the terms and conditions during the Verification Process.  (*See id.* at 25–33.)  The Court considers these arguments in turn.

### 1.    Did the Parties Enter into Shrinkwrap Agreements?

The term "shrinkwrap agreement" originates from a time when retail software packages were covered in plastic or cellophane and the written licenses became effective as soon as the customers removed the plastic or cellophane wrappings from the packages. *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1449 (7th Cir. 1996).  Because shrinkwrap agreements arose in relation to software, customers seeking to install the software were usually required to click a button on their computer, affirmatively agreeing to the terms and conditions.  Courts historically refer to these as "clickwrap agreements."  *See Siebert v. Amateur Athletic Union of U.S., Inc.*, 422 F. Supp. 2d 1033, 1036 (D. Minn. 2006) (explaining that the "click of the word 'continue' bound the [plaintiffs]" to the terms); *see also 1-A Equip. Co., Inc. v. ICode, Inc.*, No. 0057CV467, 2000 WL 33281687, at *2 (Mass.

Dist. Ct. Nov. 17, 2000), *aff'd sub nom. 1-A Equip. Co. v. Icode, Inc.*, 2003 Mass. App. Div. 30 (Dist. Ct. 2003) ("In order to finish installing the software, the customer once again was required to agree to accept the terms of the License Agreement."). Shrinkwrap agreements most likely extend to purchases without plastic or cellophane wrapping and without customers having to click a button. *See ProCD*, 86 F.3d at 1451 (explaining that under Wisconsin law it may be "valuable to buyers and sellers alike" to simply have "[n]otice on the outside, terms on the inside, and [an explicit] right to return the software for a refund if the terms are unacceptable").

AMS argues that it entered into valid shrinkwrap agreements with Plaintiffs, citing *Rasschaert v. Frontier Commc'ns Corp.*, Civ. No. 12-3108 (DWF/JSM), 2013 WL 1149549 (D. Minn. Mar. 19, 2013), *ProCD*, 86 F.3d 1447, and *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir. 1997). (*See* Def.'s Mem. at 27–33.) But these cases fail to establish that AMS created shrinkwrap agreements here.

The District of Minnesota, in *Rasschaert*, considered different questions than the one that the Court faces in this matter. There, the court considered two issues: (1) whether a shrinkwrap agreement, in and of itself, is invalid, and (2) whether an arbitration provision, which was added to the terms and conditions after the customer subscribed to the subscription service, was enforceable. *Rasschaert*, 2013 WL 1149549, at *6–7. The court held that a shrinkwrap agreement "in and of itself" does not "render an arbitration provision invalid." *Id.* at *6. In addition, the court found the at-issue arbitration agreement enforceable, explaining that plaintiffs had previously entered into binding subscription agreements, which contained a change-in-terms provision that gave the service provider

14

the ability to unilaterally change the terms and conditions, provided it gave 30-days' notice. *Id.* at *3, 6–8. The court found that adding an arbitration provision in accordance with the change-in-terms provision was appropriate. *Id.* at *7–8.

The Defendant cites this case for the proposition that shrinkwrap agreements are not in and of themselves invalid. This Court agrees. However, the Defendant must show that such an agreement exists in this case. Put differently, Defendant must show that a valid shrinkwrap agreement exists when a customer orders a product over the telephone and the arbitration provision is available (1) on the back of the invoice that is shipped with the product, (2) via a hyperlink titled "Terms and Conditions" at the bottom of the confirmation e-mail, or (3) on its website during the Verification Process. *Rasschaert* does not help the Court with those issues, and, therefore, is inapposite.

The same is true for *ProCD*. In *ProCD*, the Seventh Circuit held that a "vendor, as master of the offer" has the ability to "invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance." 86 F.3d at 1452. There, the vendor sold software stored on CD-ROM discs that were packaged in boxes at retail stores. *Id.* at 1450. Every box stated that it came with restrictions outlined in an enclosed license. *Id.* The license was printed in the manual, which was inside the box; it was also encoded on the CD-ROM disks and appeared on the customer's screen every time the software was used. *Id.*

The Seventh Circuit held that this was a valid shrinkwrap agreement. *Id.* at 1451–53. The court explained that the vendor had changed the timing of final acceptance by proposing "a contract that a buyer would accept by *using* the software after having an

opportunity to read the license at leisure." *Id.* at 1452.  Moreover, the court noted that the plaintiff "had no choice, because the software splashed the license on the screen and would not let him proceed without indicating acceptance." *Id.*  Under those conditions, the court concluded that the vendor had "extended an opportunity to reject if a buyer should find the license terms unsatisfactory" and that the customer had "inspected the package, tried out the software, learned of the license, and did not reject the goods." *Id.* at 1452–53.

That is nothing like what happened here.  Unlike *ProCD*, AMS's terms and conditions did not splash in front of Plaintiffs before they opened the box with the coins.  Also unlike *ProCD*, AMS—and the Court for that matter—cannot rest assured that these elderly Plaintiffs learned that AMS's acceptance was conditioned on their agreement with the terms and conditions.  In fact, no evidence exists that Plaintiffs actually saw the invoices, the e-mail confirmations, or even knew where to find the terms and conditions.

Likewise, *Hill* is unpersuasive.  There, a customer ordered a Gateway computer by telephone, and the computer arrived with terms and conditions inside the box, which were said to govern unless the customer returned the computer within 30 days.  *Hill*, 105 F.3d at 1148.  The customer opened the box and noticed the statement of terms, but did not read them closely.  *Id.*  The Seventh Circuit found that this was a valid shrinkwrap agreement, remanding to the district court to compel arbitration.  *Id.* at 1151.  As outlined above, this is not what happened here.  Defendant has put forth no evidence that Plaintiffs agreed to condition the purchase on their acceptance of the terms and conditions, and no evidence shows that Plaintiffs noticed the terms and conditions but chose not to read them, like in *Hill*.

16

Defendant argues that the transcripts from the Verification Process show that AMS created shrinkwrap agreements with the Plaintiffs. (*See* Def.'s Mem. at 32–33; Def.'s Reply at 6–7.) But that argument fails because the Verification Process took place *after* Plaintiffs placed their orders; put differently, the Verification Process *verified* already placed orders. (Ostman Decl. ¶ 28 ("Under this order verification process, *after* a customer purchases a product via phone from AMS . . . ." (emphasis added).) This is further confirmed by the fact that only orders above a threshold amount went through the Verification Process. By only requiring a subset of orders to go through the Verification Process, AMS confirms contracts are formed between AMS and its customers prior to that process; otherwise, all orders would need to go through the Verification Process to be finalized.

Despite AMS's insistence that this is a shrinkwrap agreement case, the facts are more like those in *U.S. Money Rsrv., Inc. v. Kagan*, No. A-18-CV-577-LY, 2019 WL 1313469 (W.D. Tex. Jan. 29, 2019). In *U.S. Money*, the Western District of Texas addressed a very similar fact pattern: a company sold overpriced coins to a woman in her 90s, shipping an invoice with an arbitration clause on the backside with the coins. 2019 WL 1313469, at *1–3. The court analyzed Texas Business & Commerce Code § 2.206(a)(2).[7] *Id.* at *3. The court concluded that the terms on the backside of the invoice were mere proposals for additional terms, finding that the customer made an offer to buy and the coin dealer accepted that offer either when it promised shipment or actually shipped

---

[7]    Tex. Bus. & Comm. Code § 2.206(a)(2) is identical to Minn. Stat. § 336.2.206.

the coins.  *Id.*  The court also found that the coin dealer provided no evidence that the customer had actual or constructive knowledge of its website's User Agreement, citing no evidence that, when the customer went to the website, the User Agreement popped up or that she was required to click a button confirming that she read the terms.  *Id.* at *4.

So too here. Plaintiffs are elderly individuals who ordered coins over the telephone and AMS is attempting to bind them to arbitration after the fact.  The contracts were formed on the telephone, making the terms proposed in the e-mail confirmations and on the backside of the invoices mere proposals for additional terms. *See Lemmer v. IDS Props., Inc.*, 304 N.W.2d 864, 870–71 (Minn. 1980) (holding that terms on the backside of a delivery order that was sent after an oral agreement were proposals for additional terms under Minn. Stat. § 336.2-207).

Such contract formation comports with Minnesota contract law.  "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Minn. Stat. § 336.2-204.  Under the U.C.C., which has been adopted in Minnesota, the formal requirements for creating a contract are minimal.  *Lemmer*, 304 N.W.2d at 870 (citing the U.C.C § 2-204(1)). Courts usually look for conduct that shows "both a valid offer and a valid acceptance." *Grandoe Corp. v. Gander Mountain Co.*, 761 F.3d 876, 887 (8th Cir. 2014)  Whether parties have formed a contract is an objective test, "to be judged by the words and actions of the parties and not by their subjective mental intent."  *Id.* (quotation marks and citation omitted).

In *Grandoe*, the parties orally agreed to the sale of a large quantity of gloves. *Id.* at 880. The plaintiff produced the gloves, but the defendant only purchased a portion of them. *Id.* The defendant justified its refusal to purchase the remaining gloves by relying on its Vendor Buying Agreement ("VBA"), displayed on its website prior to the oral agreement. *Id.* at 880–81. Although the plaintiff never signed the VBA, the defendant argued that the plaintiff was bound by its terms because (1) it had sent the plaintiff an e-mail notification, informing it of the VBA's existence on its website, and (2) the VBA provided that the plaintiff agreed to its terms if the plaintiff accepted the purchase order, which it did. *Id.* at 888. But the Eighth Circuit noted that no evidence existed that plaintiff responded to the e-mail notification or in any way manifested its acceptance of the VBA. *Id.* at 888–89.

Here, similar to *Grandoe*, Defendant fails to present evidence that Plaintiffs responded to the e-mail confirmations or manifested acceptance of the invoices. As explained above, the objective conduct of the parties establishes that the contract was formed when AMS promised to ship the product, and no subsequent efforts by AMS changed when final acceptance occurred.[8] Accordingly, Defendant has not shown that it created shrinkwrap agreements in this case.

---

[8]   Counsel for AMS confirmed this at the hearing:

THE COURT: But you would agree that those communications, first of all, were made after an order was made, right? So there's a purchase and then those terms and conditions are identified for the plaintiff; is that right? These shrinkwrap agreements.

[COUNSEL]: Yes, that's correct, Your Honor. The order of operations is the customer tells AMS what product they want. The customer gives AMS

For those reasons, Defendant failed to meet its burden to show that a valid arbitration agreement exists with any of the Plaintiffs.

### D.   Whether Plaintiffs Can Enforce the 2016 Consent Order

Even if the Court agreed that Defendant created shrinkwrap agreements with the Plaintiffs, Defendant cannot rely on its terms and conditions to compel arbitration because the 2016 Consent Order prohibits it from doing so.

The 2016 Consent order arose from allegations that AMS took advantage of an elderly woman to sell hundreds of thousands of dollars in coins.  (2016 Consent Order at 1–5.)  After investigating those allegations, the Commerce Department found that the sales representative had, indeed, solicited and taken advantage of the woman, and that AMS failed to adequately carry out its internal quality processes and procedures to detect and correct this illegal behavior.  (*Id.* at 2–6.)  In addition, it found that AMS improperly shortened the statute of limitations period on an invoice that was not disclosed prior to the sale, and improperly placed its terms and conditions on its website—specifically highlighting the arbitration provision—without disclosing these terms prior to the sale.  (*Id.* at 6–7.)  Lastly, the 2016 Consent Order provides that it "is in the public interest."  (*Id.*)

The 2016 Consent Order requires AMS to take five actions.  As relevant here, it ordered that AMS could no longer "rely on any of its written terms or conditions of bullion

---

money for that product.  AMS then ships the product, and the terms and conditions are included with the product.

(*Ballou* matter [Doc. No. 60]; *Culver* matter [Doc. No. 47] at 16:24–17:8.)

coin/product sale to a consumer unless: (1) the term or condition upon which Respondent seeks to rely was disclosed to the consumer in accordance with Minn. Stat. § 80G.07, subd. 1, or (2) the consumer and Respondent have a signed written agreement for the purchase of bullion products disclosing such terms." (*Id.* at 7–8.) The Consent Order became effective on December 5, 2016. (*Id.* at 8.)

Here, Defendant relies on the arbitration provision in its terms and conditions to compel arbitration.[9] But Defendants have presented no evidence showing that they complied with the 2016 Consent Order. Instead, AMS contends that Plaintiffs lack standing to enforce it.[10] (Def.'s Reply at 2–3.) The Court disagrees.

To bypass the 2016 Consent Order, Defendant asserts that Plaintiffs have no standing to enforce it. (Def.'s Reply at 2–3.) They draw the Court's attention to *Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 958 (8th Cir. 2002), where the Eighth Circuit stated that "strangers to a consent decree generally do not have standing to enforce a consent decree." (*Id.*) *Pure Country* held that "for a third party to be able to enforce a consent decree, the third party must, at a minimum, show that the parties to the consent

---

[9]     The 2016 Consent Order became effective on December 5, 2016. (2016 Consent Order at 8.) Accordingly, this analysis is limited to sales occurring after that date. Relying on Defendant's customer history reports, this period includes 21 orders by Ballou, 4 orders by Williamson, and 49 orders by Culver. (Ostman Decl. Exs. 1, 46, 50).

[10]     Defendant also argues that the portion of the 2016 Consent Order found to be unconstitutional is unenforceable. (Def.'s Reply at 1–2.) Because Minn. Stat. § 80G.07 has been found unconstitutional when applied extraterritorially, *Styczinski*, 2021 WL 3131550, at *7–8, the Court only addresses whether Plaintiffs may enforce the other portions of the 2016 Consent Order.

decree not only intended a benefit upon that third party, but also intended to give that third party a legally binding enforceable right to that benefit."  312 F.3d at 958.

This case meets those requirements.  Defendant agrees that the Plaintiffs are third party beneficiaries, (*Ballou* matter [Doc. No. 60]; *Culver* matter [Doc. No. 47] ("Hr'g Tr.") at 25:9–10 ("Well, there's no question the consumers here fall within the purpose of the Consent Order.")), satisfying the first requirement.

Second, the 2016 Consent Order provides that *consumers* can enforce it.  It orders the following: "IT IS FURTHER ORDERED that Respondent shall not rely on any of its written terms or conditions of a bullion coin/product sale to a *consumer* unless . . . ." (2016 Consent Order at 7 (emphasis added).)  This language necessarily means that a consumer can enforce it because the only time AMS would rely on its terms and conditions is when it wants to enforce them against a consumer.  Put another way, this clause anticipates litigation between AMS and its consumers.

Defendant, however, argues that the 2016 Consent Order must *expressly* provide that third parties can enforce it.  (Hr.'g Tr. at 25:12–14.)  But that is not the law in the Eighth Circuit.  *Cf. Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of City of St. Louis*, 894 F.3d 959, 966 (8th Cir. 2018) (permitting a third party to intervene to enforce consent agreement's proper scope).  What is more, AMS's interpretation would require the Commerce Department to intervene whenever AMS seeks to enforce its terms and conditions more broadly than permitted by the Consent Order.  Such an interpretation is not logical given the circumstances.

The Eighth Circuit has explained that "[w]hen construing a consent decree, courts are guided by principles of contract interpretation and, where possible, will discern the parties' intent from the unambiguous terms of the written consent decree, *read as a whole*." *Pure Country*, 312 F.3d at 958 (emphasis added). The court further noted that "even when interpreting the meaning of a consent decree 'as written,' we are not to ignore the context in which the parties were operating, nor the circumstances surrounding the order." *Id.* at 958–59 (emphasis added) (internal quotation marks omitted). Accordingly, the Court analyzes the 2016 Consent Order as a whole, paying attention to the circumstances surrounding its formation.

The Court finds that the 2016 Consent Order as a whole and the circumstances surrounding it establish that it was meant to change AMS's behavior with respect to elderly consumers by requiring AMS to adequately inform them of the terms and conditions of their agreements. The Complaints in this case allege that AMS engaged in the exact same conduct that the State of Minnesota sought to deter. In response, AMS is relying on its terms and conditions to compel arbitration. But, as explained above, AMS has failed to show that it followed the 2016 Consent Order. Accordingly, Defendant cannot rely on its terms and conditions, including the arbitration provision, to compel arbitration here.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1.   Defendant's Motions to Compel Arbitration and Stay Proceedings (21-cv-00694 [Doc. Nos. 10, 26]; 21-cv-01237 [Doc. No. 14]) are **DENIED**; and

2.   Plaintiffs' Motions to Strike (21-cv-00694 [Doc No. 40]; 21-cv-01237 [Doc.

No. 27) are **DENIED**.

Dated: December 8, 2021              s/ Susan Richard Nelson
                                     SUSAN RICHARD NELSON
                                     United States District Judge